COATNEY v. ST. LOUIS & SAN FRANCISCO RAILWAY
COMPANY, Appellant.

**In Banc, June 19, 1899.**

1. **Appeals:** ORDER SETTING ASIDE NONSUIT. An order setting aside
   a nonsuit can be appealed from under the statute of 1891, amend-
   ing section 2246, R. S. 1889. (Following State ex rel. Cass Co. v.
   Railroad, 149 Mo. 104, and overruling Ready v. Smith, 141 Mo. 305.)

2. ——: ——: EQUAL TO AN ORDER GRANTING NEW TRIAL. An order
   setting aside a nonsuit is an order after judgment, and is not,
   therefore, "an interlocutory order." Its effect and purpose are to
   set aside a judgment that would otherwise be final in the case, and
   to grant a new trial thereof, and therefore it is "an order granting
   a new trial."

3. **Negligence:** SETTING ASIDE NONSUIT: EVIDENCE REVIEWED. The
   plaintiff's evidence in this case, one in which a widow sued a rail-
   road company for negligently killing her husband, is set out and
   reviewed, and it is held that this evidence not only fails to disclose
   any negligence on the part of the company's servants, but does dis-
   close that deceased came to his death by his own negligence. *Held,*
   further, that the trial court erred in setting aside a nonsuit, taken
   by plaintiff when the court sustained a demurrer to her evidence,
   and in granting her a new trial.

*Appeal from Lawrence Circuit Court.*—HON. J. C. LAMSON,
Judge.

REVERSED AND REMANDED (*with directions*).

L. F. PARKER and J. T. WOODRUFF for appellant.

(1) The question to be determined by this court is
whether or not the trial court properly sustained the demurrer
at the close of plaintiff's evidence. If it did, then it neces-
sarily follows that error was committed in setting aside the
verdict based upon that demurrer, for the reason that the mo-
tion to set aside the nonsuit alleges merely that the court erred

in sustaining the demurrer, and the court sustained the mo-tion upon that ground only, there being no reason given for its action in so doing. (2) There was not a particle of evidence that any employee of the defendant saw the deceased before he was killed. In fact it is left to conjecture entirely what train struck him. Under such circumstances the deceased was a trespasser, and defendant owed him no duty except not to injure him after his danger was discovered. Section 2611, R. S. 1889; Yarnell v. Railroad, 75 Mo. 575; Barker v. Railroad, 98 Mo. 50; Hyde v. Railroad, 110 Mo. 272; Price v. Railroad, 7 A. & E. R. R. C. (N. S.) 115; Barney v. Railroad, 126 Mo. 372; Maher v. Railroad, 64 Mo. 276; Hallihan v. Railroad, 71 Mo. 113; Maloy v. Railroad, 84 Mo. 270; Williams v. Railroad, 96 Mo. 275; Shaw v. Railroad, 104 Mo. 648. (3) There is not a particle of evidence that the deceased was discovered on the bridge, and no facts were shown from which it can be inferred that he was seen. The natural inference is that he was lying upon the track, either unconscious of his danger or unable to avoid it. If such had not been the case he certainly would have jumped from the trestle to the ground, which was but eight feet. If he was in a helpless condition by reason of intoxication voluntarily imposed, complaint can not be made that defendant was negligent in failing to observe his situation in time to save him from injury. Beach on Con. Neg. (2 Ed.), sec. 391; Kuhn v. Railroad, 32 S. W. 88. (4) It may be urged that the deceased was a licensee and being such defendant owed him the duty of looking out for him and thus save him from harm, notwith-standing his exposed position, brought on by his drunkenness. The answer to that position is, that being a trespasser *abinito* he can claim no rights as a licensee and his intoxication greatly intensified the trespass. R. S. 1889, sec. 2611; Hyde v. Railroad, 110 Mo. 272; Felton v. Aubrey, 74 Fed. Rep. 350; Anderson v. Railroad, 87 Wis. 195.

CLOUD & DAVIS for respondent.

BRACE, J.—This is an action brought by the plaintiff, the widow of James Coatney, deceased, to recover $5,000 damages for the death of her husband, which she alleges, in her petition, was caused by the negligence of the defendant. On the trial, at the close of plaintiff's evidence, the court instructed the jury that under the pleadings and evidence the plaintiff was not entitled to recover. Thereupon the plaintiff took a nonsuit with leave; and judgment was rendered in favor of the defendant for costs. In due time plaintiff filed her motion to set aside the nonsuit, on the ground that the court erred in sustaining the defendant's demurrer to plaintiff's evidence, which motion coming on to be heard was by the court sustained, the nonsuit set aside and "plaintiff granted a new trial" to which action of the court the defendant excepted and appealed.

In due course, the case reached this court, and was assigned to Division No. 2, where the plaintiff filed her motion to dismiss the appeal, on the ground "that there is no judgment from which an appeal will lie." Whereupon the case was transferred to the Court in Banc for determination, by Division No. 2 on its own motion. On the hearing in banc the motion to dismiss was taken with the case, and presents the first question to be determined.

(1) By an Act of the General Assembly approved April 18, 1891 (Laws 1891, p. 70), section 2246 of the Revised Statutes of 1889, providing for an appeal only in cases of "final judgment or decision," was repealed, and a new section enacted in lieu thereof, providing that "any party to a suit aggrieved by any judgment of any circuit court, in any civil cause from which an appeal is not prohibited by the Constitution, may take his appeal to the court having appellate jurisdiction from any order granting a new trial, or in

arrest of judgment, or dissolving an injunction, or from any interlocutory judgments in actions of partition which determine the rights of the parties, or from any final judgment in the case, or from any special order after final judgment in the cause."

In Ready v. Smith, 141 Mo. 305, a case coming under the operation of this law, and decided in Division No. 2 on the 9th of November, 1897, it was held that an appeal does not lie from an order setting aside a nonsuit, and reinstating the case, while in the subsequent case of State ex rel. Cass County v. Railroad, 149 Mo. 104, a like case also governed by this law, decided by Division No. 1, February 15, 1899, it was held, without mention of the former case, that an appeal does lie from an order setting aside a nonsuit and granting a new trial. It was in view of, and to remove the conflict between these cases, that this case was transferred, to the Court in Banc.

The law of 1891 was set out in the opinion in Ready v. Smith, but most of the opinion was devoted to the discussion and decision of the question whether or not an appeal would lie under that provision of the law giving an appeal from "any final judgment." The question as to whether an appeal would lie under any other provision of the law was disposed of summarily in the following language: "It will be noted that an order or judgment setting aside a nonsuit is not enumerated in the statute as an order from which an appeal may be taken. If permitted, then it must be under the general clause allowing an appeal from "any final judgment." . . . . The act of 1891 was before this Court in Banc for interpretation in Greeley v. Railroad, 123 Mo. 157, and it was pointed out that it was the purpose to allow appeals from certain orders which up to that time had been held to be merely interlocutory and not final in their nature, and the appeal in that case was dismissed because an order appointing a receiver was not mentioned among those orders mentioned by the

statute of 1891. Applying the reasoning of that case, it is obvious, we think, that as an order setting aside a nonsuit is not final and as the statute has not made it appealable in terms, it must be held that an appeal can not be prosecuted therefrom, and the appeal in this case must be and is dismissed." This was all that was said on the question now at issue, and the reasoning falls far short of covering that issue. It may be conceded that an appeal would not lie under the general clause and that one of the purposes of the law was "to allow an appeal from certain orders which up to that time had been held to be merely interlocutory and not final." But this was not by any means the whole scope of that legislation, for in addition it expressly provided for an appeal "from any order granting a new trial" and "from any special order after final judgment in the cause." The bearing of which upon the question seems not to have been considered in that case. Now, an order setting aside a nonsuit is an order after judgment, and is therefore not "an interlocutory order." Its effect and purpose are to set aside a judgment that would otherwise be final in that case, and to grant a new trial thereof, and therefore it is an "order granting a new trial." So that with these unquestionable characteristics of an order setting aside an involuntary nonsuit staring us in the face, when the subsequent case of State ex rel. Cass Co. v. Railroad, came on for determination in Division No. 1, we held: "The right of appeal from an order sustaining a motion for a new trial was given by an act of the General Assembly approved April 18, 1891. In that act, no mention is made, by that name, of an order sustaining a motion to set aside an involuntary nonsuit, but such an order is necessarily comprehended in the words 'order granting a new trial.' The proceeding which results in a ruling that enforces a nonsuit is as much a trial as the proceeding which results in a verdict, and the judgment which follows an involuntary nonsuit is as final a disposal of the case, in which it is rendered as is the judgment

that follows a verdict in such case. The effect of the judgment on the cause of action involved is not the same in both cases. The cause of action being extinguished in the judgment on a verdict, but surviving the judgment on the nonsuit; but so far as the suit itself is concerned, it is as completely ended in the one case, as the other. What is a trial? Our statute answers the question (section 2130, R. S. 1889): 'A trial is the judicial examination of the issues between the parties, whether they be issues of law or fact.' The proceeding in this case, then, amounted to a trial although it culminated on an issue of law, and the effect of sustaining the motion to set aside the nonsuit is nothing more than granting a new trial of that issue. Defendant therefore had a right to this appeal."

When it is considered in connection with this reasoning, that the very essence of an involuntary nonsuit is, that it be the product of adverse rulings which cover the case and preclude a recovery as has frequently been decided [Green County Bank v. Gray, 146 Mo. 568; McClure v. Campbell, 148 Mo. 96], it becomes so palpably evident that a judgment on such a nonsuit is the consummation of a trial of the case, and that the setting aside of that judgment and granting another trial upon the issues thereof is "granting a new trial" within the meaning of the statute, that we can not hesitate to give our assent to the conclusion reached. Hence the decision in Ready v. Smith on this subject will be overruled, and the ruling in State ex rel. v. Railroad, followed; and the motion to dismiss the appeal in this case will be denied.

(2) Plaintiff's cause of action as stated in the petition is as follows:

"That near said city of Granby there is on said railroad a bridge spanning a stream which the defendant has permitted the public to use as a footway crossing for over twenty years continuously and undisputedly, and as such had become a public traveled crossing of said railroad. That on the 5th

day of October, 1890, the plaintiff's husband, James Coatney, was, at a time when no regular trains were crossing said bridge, lawfully crossing the same, using all the care possible under the circumstances, when a special train of cars drawn by a locomotive carelessly and negligently approached said bridge and crossing from the west, when said Coatney was midway on said bridge and crossing, at the unusual speed of 30 miles per hour, without sounding the whistle or ringing the bell on said locomotive at a distance of 80 rods or any other distance from said crossing, or another crossing 100 yards west thereof, and, without checking or attempting to check the speed of said train, although said James Coatney was in plain view of said employees and agents of defendant in charge of said train for the distance of 80 rods, then and there carelessly and negligently struck and killed the said James Coatney, who was at the time making every effort in his power to get out of the way of said train."

The answer of defendant was a general denial and a plea of contributory negligence.

As the only ground for setting aside the nonsuit was the alleged error of the court in sustaining the demurrer to the evidence, it is perhaps as well to let the evidence speak for itself. As furnished in the abstract of the appellant of which no complaint is made, it is as follows:

T. J. Reynolds testified that he resided in Granby in October, 1890, and knew James Coatney, and had known him eight or ten years; saw Coatney on Sunday, October 5, 1890, and went fishing with him and Will Broen on that day. "We started between 1 and 2 o'clock, and went down on the south side of the creek; crossed the second bridge and came back to the Skinner Lake, and had our net in, I believe, twice before we crossed the bridge and came back to the lake and lost Coatney there, some way, I can't tell how; we went to a spring there is up there and waited for a while and he never come. Will Broen was with me, and went back to look for

him and couldn't find him, and we thought he had taken the near way and waded the creek and come home." That Granby City is about one and a half miles from Granby; that the first bridge is about 300 yards below the depot and that the second bridge is about a mile and a half west of the first bridge. That they remained in the neighborhood of the second bridge until about 5 o'clock, when they started home. "We got ahead of Coatney somewhere there right across from the Skinner Lake; I guess these men have got it in the deposition here; we went ahead of him there somewheres; we thought he had gone on, you know, and crossed at the ford and come on home; in the place of that he didn't." That they went up the railroad and crossed the first bridge and got home "just a little before dark." That he heard, or someone told him, that a train whistled twice just as he got to Granby. It was getting along towards night. The three of them had a pint and a half of alcohol when they started. That they used a pint of it up to the time he and Broen got separated from Coatney and "I believe Coatney had about a half pint of it when we left him." All of them used a pint of alcohol. They weakened the alcohol before drinking it. That Coatney was in the habit of drinking occasionally, but was all right when they left him, as far as he knew. That he had been acquainted with the bridge ever since it was built, which he guessed was about twenty years. That the bridge was used to cross on.

On cross-examination the witness testified that he, Broen and Coatney met that afternoon and decided to go fishing. Coatney had a pint of alcohol, Broen had half a pint and witness had the seine. Had seen Coatney take a drink in the morning and at the time they started could tell that he had been drinking some. They started out and went down on the south side of Shoal Creek to the second bridge. There they crawled through the barbed wire fence and got on the railroad track, went along the railroad to the second bridge

and crossed it. After crossing the bridge and going east several hundred yards they stopped at a spring to get a drink and there missed Coatney. Broen went back and hunted for him but did not find him, and they then went on without him, crossing the east or first bridge and keeping the railroad track to Granby City. That Coatney could walk when they left him, but not very straight; was a little full, but did not stagger much; that he was fuller in the morning than when witness left him on the railroad. He had sobered off on the alcohol he had drunk that afternoon. That Coatney crossed the second bridge and they lost him on the railroad between it and the first bridge. That the afternoon was cloudy and there was a drizzling rain.

Will Broen testified that he knew Coatney in his lifetime; that Coatney was a miner and witness worked with him; that on the day in question he, Reynolds and Coatney went fishing. On reaching Shoal Creek they fished a little, went down the creek, crawled through the railroad fence, got on the railroad, walked across the second bridge and started home by way of Granby City, taking the railroad east by way of the first bridge. They left Coatney on the railroad between the two bridges. "He was following along behind. I told him to come on, that he would get wet if he did not come on. It was kind of misting rain and he did not come. He was walking along and says, 'I am coming.'" On reaching a spring half way between the bridges they missed Coatney, and witness went back to a point where he could see to the second bridge, to look for him, but could not find him, and he and Reynolds then went on to Granby. That he had used the bridge to cross Shoal Creek five or six years; that they took a pint and a half of alcohol with them that afternoon, and drank it, taking the last drink at Skinner Lake. "Do not know how many drinks I took on that drunk. I had so many it was too hard to count them." That Coatney kept the pint bottle and it had about a half pint in it.

On cross-examination witness testified that alcohol when mixed with an equal amount of water is about as strong as whisky, and that diluting what they started with on that day in that proportion would make a quart and a pint of diluted alcohol as strong as whisky; that if they had drunk it all each would have had as much as a pint of whisky; that Coatney when he started had been drinking and when they left him had about a half pint of diluted alcohol. That after getting on the railroad they crawled through the railroad fence and went to Skinner Lake; then crawled through on their way back and got on the railroad again. "I told him to come on, he would get wet. It was misting rain." They waited for him. "We wanted him to go home with us. He was older than I, but he was a friend of mine and I wanted to take care of him. One reason was that I thought he was too full and could not get home. I went back and looked for him but could not see anything of him. We then crossed the first bridge and went home. When we got a mile or so from the railroad track we heard a whistle but could not tell whether it was east or west of Granby City. The railroad is fenced between the two bridges. At the road crossing just west of the first bridge there are cattle guards. From the crossing east of the first bridge the railroad curves some. It commenced to drizzle rain while we were at Skinner Lake and was kind of misting from that time on. Coatney was in such a condition that he staggered to a certain extent when we lost him."

Anton Stanka testified, that he was in Granby City on the day Coatney was killed; that the regular passenger train due there at 5:56, was late and he waited until after 6 o'clock and started home before its arrival, going down the railroad by way of the first bridge; that there is an approach to the bridge from the east of a trestle about ten or twelve feet high, which is about 200 feet long; that the bridge proper is about 100 feet long. After he crossed the bridge and got away from the railroad about one and a fourth miles he heard the

train whistle twice near the bridge. It was a freight train coming from the west. It was between six and seven o'clock and was getting dark. Had been a section foreman on that road and knew the road. There is a road crossing about sixty yards from the west end of the bridge and the railroad curves just at the west end of the bridge, "kind of in the shape of the letter S." Did not know whether one 150 yards west of the bridge could see through or not. A man would have to look pretty close to see through 130 yards. It is a covered bridge. It is about three-fourths of a mile from the Granby City depot to the first bridge and about a mile from the first bridge to the second bridge. Knew the bridge for ten or twelve years and it had been crossed over by people some days more than others. Had seen the place on the trestle where Coatney was killed. The trestle at this point is about eight or ten feet high. There was no water under the trestle at that time.

On cross-examination witness testified: "The track commences to curve to the south about two rails west of the bridge, and then curves to the north, and an engine approaching it from the west would get within sixty feet before it struck the straight track, until it did come within sixty feet of the bridge the train would be on a curve, and the headlight would not shine around the curve, but would throw the light straight ahead.

Joseph Zehr testified that on the day Coatney was killed at the bridge, he lived in Granby City, which is a way station on the Frisco railroad, consisting of a depot, section houses, a mill and another house or to, the town of Granby being about a mile south of Granby City. The distance from the bridge to the depot is about twelve telegraph poles, and from the depot to witness's house is about five telegraph poles. These poles are 180 feet apart. Was in the house and heard the train about three miles west of the bridge where Coatney was killed. "I heard it give three whistles for the crossing.

I saw it when it got to the whistling post, but heard it west of there. Saw it from the time it whistled until it got to the depot. Saw an object on the bridge when the train came to the bridge. Didn't know what it was. Would not swear what it was. It looked like a man. It was on the trestle of the bridge about two and a half rail lengths from the bridge proper. The object was up. I could not tell what it was. It looked like it was trying to get out of the way mighty fast. Could not tell anything about the motion it was making, only saw the object moving east. When I first saw the object the train was at the west end of the bridge about the length of six rails from it. About the time the train struck the west end of the bridge it whistled and I thought I heard some one "hollo." There were some campers on the other side of the creek and I thought it was them. Had worked on this section before the accident. Railroad curves considerably west of the bridge. About an hour after the train passed I heard that Coatney was killed and went down there. He had been struck about sixty-five feet west of the east end of the trestle and was badly mangled."

On cross-examination witness testified: "It was dark when I saw the object. Didn't know whether it was killed or not. Didn't go to see until I heard of the accident. I was at the house three hundred yards from the bridge. There were some trees between the house and bridge near the trestle a little to the north. The bridge has upright iron sides and iron over the top. Do not know that a headlight would throw shadows on bridge in the direction train was coming. Thought it was a man but did not go down to see. An inquest was held that night." Witness knew the purpose was to find out how deceased came to his death. Was present. Did not tell the coroner or any other person about what he had seen. "It was not my business to tell them until I was called on to do so."

Ben Zehr testified that he lived in Granby City on the day Coatney was killed, and that it was about dark. Was in the house about a quarter of a mile from the bridge, sitting at a table writing a letter. Heard the train from the west whistle twice near the bridge. Understood two whistles were for loose brakes. My brother Joseph was outside of the house on the porch when we heard of the accident. My brother Joe, Mr. Whipple and I went down there. The bridge there is used every day by persons to cross the creek.

On cross-examination the witness said "my brother Joe did not say anything about having seen the object while at the house that evening, nor on the way down there after we heard Coatney was killed."

Wm. Lambert testified that he is a brother of plaintiff and lived in Granby at the time Coatney was killed. Saw him in the morning of that day and he was perfectly sober. Saw him on the bridge that night after he was killed. The lower part of the body was on the inside of the rail and his head and shoulders on the outside of the south rail. Everybody used the bridge that went across there. Could safely say that he had seen the bridge used by people crossing hundreds of times.

J. T. Martin testified: Had seen persons cross bridge ever since it was built. Did not think one could see straight through from the public road. Might a little past the road.

S. C. Hart, justice of the peace, testified that he acted as coroner and held the inquest over Coatney's body. At the place of the accident found hundreds of pieces of flesh and bones scattered on the trestle of the bridge. Had seen people cross there frequently. The road begins to curve to the south at the west end of the bridge and after one gets out several hundred feet can not see through the bridge. The railroad fence begins on each side of the track right up to the west end of the bridge.

Jack Hudson testified that he was a brother-in-law of the deceased. Had been in several kinds of business during the last three years. Had been a city marshal of Granby, but was not then. On the day Coatney was killed went down to the depot with Col. Tom Freeman who was going to St. Louis. The passenger train was late. A freight train passed just before the passenger and could see it through the bridge to the other side. The train passed quite a little bit after the passenger train was due. It whistled just as it came on the bridge or a little before, but the speed was not checked. You can go west of the crossing and see through the bridge.

J. M. Lambert testified that the plaintiff, Mrs. Coatney, was his daughter. That he saw Coatney on the morning of the day he was killed before he started out fishing. "I supposed he had been taking a little to drink but he talked with all his wits. He talked as well as he ever did in his life and walked straight."

We have carefully scanned this testimony but have failed to find in it any evidence tending to prove that the servants of the defendants were guilty of any negligence contributing to the death of the plaintiff's husband. We do find in it abundant evidence that the proximate cause of his death was his own negligence, superinduced by an intoxicated condition willfully brought on himself, and we do not find any evidence tending to prove that the defendant's servants willfully, wantonly or recklessly ran him down and killed him, when by the exercise of proper care, they might have avoided it. Consequently, we find no ground therein upon which a recovery by the plaintiff could be predicated. Counsel for plaintiff has furnished us no brief showing any such ground and as the evidence may well speak for itself, and a discussion of it in the light of settled principles and adjudicated cases would be not only a thrashing of old straw and as the exercise itself, would consist merely in setting up men of

straw and knocking them down again, we shall content our-
selves with the simple announcement of this conclusion:

The court erred in setting aside the judgment on the
nonsuit and in granting the plaintiff a new trial and its order
to that effect will be reversed and the cause remanded with
direction to set the same aside. SHERWOOD, ROBINSON,
MARSHALL and VALLIANT, JJ., concurring; GANTT, C. J.,
and BURGESS, J., dissenting.